UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DARIUS KIMBROUGH,

       Petitioner,

v.                                     CASE NO. 6:05-cv-265-Orl-22UAM

JAMES V. CROSBY, JR., et al,

       Respondents.

_____

## ORDER

This case is before the Court on the Petition for Habeas Corpus Relief (Doc. No. 1) and Memorandum of Law (Doc. No. 8) filed by Darius Kimbrough. Pursuant to the instructions of the Court, Respondents filed a Response to Petition for Writ of Habeas Corpus (Doc. No. 15). Thereafter, Petitioner was given the opportunity to file a reply to the response, but declined to do so. *See* Doc. No. 19.

## I.    STATEMENT OF THE FACTS

The facts adduced at trial, as set forth by the Supreme Court of Florida, are as follows:

> The victim, Denise Collins, was found nude and semi-conscious in her bathroom by paramedics; she was covered with blood. The sliding glass door to her second floor apartment was partially open, and there were some ladder impressions under the balcony. Collins was rushed to the hospital, where she died soon thereafter.
>
> The officers took semen evidence from the bedsheets, took blood evidence from the victim, and found pubic hairs in the bed and in a towel. The

samples were sealed in a bag and sent to the Florida Department of Law Enforcement lab for analysis.

A resident of the apartment complex-Lee-told officers that he had twice seen a man in the vicinity of the apartment and had seen a ladder on the apartment's balcony.  Officers were unsuccessful in searching for the man, but later Lee identified Kimbrough from a picture lineup.  A workman in the complex-Stone-identified Kimbrough as a man who had watched him putting away a ladder in the complex around the time of the murder.

The DNA evidence showed that the semen taken from the bedsheets was compatible with Kimbrough's, and some of the pubic hairs matched his. There were, however, additional pubic hairs from another unidentified black man and a caucasian male.  The DNA evidence indicated that the blood samples taken from the bed matched Kimbrough's.

The medical examiner testified at trial that the victim had a fractured jaw and fracturing around her left temple.  The cause of death was hemorrhaging and head injury in the brain area resulting from blunt injury to the face.  There was also evidence of vaginal injury, including tears and swelling consistent with penetration.  There were bruises on her arms.

The defense's theory suggested that the victim's ex-boyfriend-Gary Boodhoo-had committed the crime since he was with the victim shortly before, had used a ladder before at her apartment, had a key, and had beaten her previously.  The evidence of prior beating was excluded.

In the sentencing order, the judge listed three aggravators: prior violent felony, committed during the course of a felony, and heinous, atrocious, or cruel (HAC).  To support the prior violent felony aggravator, the judge cited Kimbrough's prior convictions for both burglary of a dwelling with battery therein and sexual battery.  The court found that the murder here was committed during sexual battery or attempt to commit sexual battery, citing DNA evidence and bruising, as well as evidence that the victim and defendant did not know each other.  HAC was supported by the size of the victim, the three blows to her head causing fracture by blunt force, evidence of a struggle (the room was in disarray), and the amount of blood found around the room.

The judge considered age as a statutory mitigator (Kimbrough was nineteen), but rejected it because there was no evidence establishing that he was

immature or impaired.  The court considered the following nonstatutory mitigation: Kimbrough had an unstable childhood, maternal deprivation, an alcoholic father, a dysfunctional family, and a talent for singing.  The court found that the mitigation did not temper the aggravators.

*Kimbrough v. State*, 700 So. 2d 634, 635-36 (Fla. 1997), *cert. denied*, 523 U.S. 1028 (1998).

## II.    PROCEDURAL HISTORY

Petitioner was charged by indictment with one count of first-degree murder, one count of burglary of a dwelling with a battery therein, and one count of sexual battery with great force.  (Ex. A-23 at 254-55.)[1]  After a jury trial, Petitioner was found guilty as charged on all counts in the indictment.  (Ex. A-23 at 448.)

A new jury was selected for the penalty phase because three jurors had read newspaper articles about the trial after the guilty phase.  At the penalty phase of the proceedings on the first-degree murder conviction, the jury recommended, by a vote of eleven to one, that the trial court impose the death penalty upon Petitioner.  (Ex. A-24 at 532.)  The trial judge concurred with the jury's recommendation and sentenced Petitioner to death.[2]  (Ex. A-24 at 584, 595-601.)

On direct appeal, Petitioner raised the following arguments, and the Supreme Court of Florida found as follows:

1.      The evidence was insufficient to support the verdict.

---

[1]References to the record will be made by citing to the particular volume and page of the advanced appendix.  For example, "Ex. A at 1" refers to page one of the volume labeled Exhibit A.

[2]Petitioner was also sentenced to concurrent terms of life in prison as to the other two convictions.

<u>Result</u>: The claim was found to lack merit because competent and substantial evidence existed to support the jurys' verdict and sentence.

2.      It was error to prohibit introduction of defense testimony about other crimes or bad acts.

<u>Result:</u> The trial judge did not abuse her discretion when she prohibited this defense testimony.

3.      It was abuse of discretion for the judge not to find the statutory mitigator of age at the time of the offense.

<u>Result:</u> There was no abuse of discretion in failing to find age as a statutory mitigator.

4.      The death sentence was disproportionate and there was an improper weighing of mitigators.

<u>Result</u>: Given the three statutory aggravators, no statutory mitigators, and weak nonstatutory mitigators, the death sentence was not disproportionate to other similar cases.

5.      There was an erroneous instruction on and finding of the heinous, atrocious, or cruel aggravator.

<u>Result</u>: The trial court conducted a thorough analysis and the record contained voluminous evidence of suffering.  The claim was found to be without merit.

6.      It was error to excuse for cause a qualified juror over defense objection.

<u>Result:</u> The trial court did not abuse its discretion in excusing the juror for cause.

7.      It was error to find that the murder was committed during the course of a sexual battery.

<u>Result:</u> There was competent and substantial evidence to support this aggravator.

4

8.      Section 921.141, Florida Statutes (1993) was unconstitutional.

      Result: The claim was rejected without discussion as meritless.

*Kimbrough v. State,* 700 So. 2d 634 (Fla. 1997).  Petitioner filed a petition for writ of certiorari

with the United States Supreme Court, which was denied.  *Kimbrough v. Florida,* 523 U.S.

1028 (1998).

      On March 10, 2000, Petitioner filed with the state trial court an amended motion for

postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 raising twenty

claims (Ex. C-20 at 1472-1526).  On September 22, 2000, the trial court conducted a *Huff*

hearing, at which time Petitioner abandoned claims 1, 3, and 20.  The trial court granted an

evidentiary hearing as to claims 5, 10, and 19.  After conducting an evidentiary hearing, the

trial court entered an order denying all claims, as follows:

1.      This claim was abandoned at the *Huff* hearing.

2.      Trial counsel was ineffective for failing to adequately challenge the
        credentials of State expert witness Charles Badger.

        Result: This claim was summarily denied.

3.      This claim was abandoned at the *Huff* hearing.

4.      Petitioner's right to a jury composed of a cross-section of the
        community was violated by trial counsel's failure to rehabilitate
        venireperson Mattie Barnwell.

        Result: This claim was summarily denied.

5.      Trial counsel was ineffective for failing to voir dire juror Louisa
        Devose regarding her connection to the crime scene.

        Result: This claim was denied after an evidentiary hearing.

6.      Trial counsel was ineffective for failing to discover during voir dire juror Eddie Julian's connection with the Florida Department of Law Enforcement.

        Result: This claim was summarily denied.

7.      Trial counsel was ineffective for failing to move for a mistrial after the State's improper closing argument.

        Result:  This claim was summarily denied.

8.      Florida's capital sentencing statute was unconstitutional on its face and as applied.

        Result: This claim was summarily denied.

9.      Petitioner was denied his right to a fair and impartial jury by prejudicial pretrial publicity, by the lack of a change of venue, by a failure to sequester the jury, and by events in the courtroom during trial.

        Result: This claim was summarily denied.

10.     Trial counsel was ineffective for allowing excessive security measures or shackling at trial to deprive Petitioner of a fair trial.

        Result: This claim was denied after an evidentiary hearing.

11.     Execution by lethal injection constitutes cruel and unusual punishment.

        Result: This claim was summarily denied.

12.     Execution by electrocution constitutes cruel and unusual punishment.

        Result: This claim was summarily denied.

13.     Petitioner's trial was fraught with procedural and substantive errors which deprived him of a fair trial.

        Result: This claim was summarily denied.

14. The jury received inadequate guidance concerning the aggravating circumstances to be considered.

    Result: This claim was summarily denied.

15. The penalty phase jury instructions were incorrect under Florida law, the sentence of death was unconstitutional, and counsel was ineffective for failing to object.

    Result: This claim was summarily denied.

16. Petitioner's sentence rests upon an unconstitutionally automatic aggravating circumstance.

    Result: This claim was summarily denied.

17. Penalty phase counsel was ineffective for failing to object when the State overbroadly and vaguely argued aggravating circumstances.

    Result: This claim was summarily denied.

18. Trial counsel was ineffective for failing to move for a mistrial after the State disclosed that one of the jurors had a connection with a Florida Department of Law Enforcement employee.

    Result:  This claim was summarily denied.

19. Petitioner was denied his right to adequate mental health assistance under *Ake v. Oklahoma*, 470 U.S. 68 (1985).

    Result:  This claim was denied after an evidentiary hearing.

20. This claim was abandoned at the *Huff* hearing.

(Ex. C-23 at 2171-97.)  Petitioner appealed the denial of relief on claim 19 and the denial of

an evidentiary hearing on claims 2, 4, 6, 7, and 18.  As to claim 19, the Supreme Court of

Florida found that Petitioner had not shown either deficient performance or prejudice.  In

addition, the Supreme Court of Florida concluded that summary denial of the other five claims was proper.  *Kimbrough v. State*, 886 So. 2d 965 (Fla. 2004).

Petitioner also filed a Petition for Writ of Habeas Corpus with the Supreme Court of Florida, raising two claims: (1) Florida's death sentencing statutes as applied are unconstitutional pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), and (2) the Eighth Amendment right against cruel and unusual punishment will be violated as he may be incompetent at the time of the execution.  The Supreme Court of Florida rejected both claims and denied the petition.  *Kimbrough v. State*, 886 So. 2d 965, 984 (Fla. 2004).

## III.    GOVERNING LEGAL PRINCIPLES

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003).  The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

## A.    Standard of Review Under the AEDPA

8

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Schwab v. Crosby*, 451 F.3d 1308, 1324 (11th Cir. 2006) (stating that the federal law relevant to this analysis is the United States Supreme Court precedent "in existence at the time the conviction became final"), *cert. denied*, 127 S.Ct. 1126 (2007).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005), *cert. denied*, 127 S. Ct. 348 (2006). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a

federal habeas court may grant the writ if the state court identifies the correct
governing legal principle from [the United States Supreme Court's] decisions
but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas
relief is appropriate only if that application was "objectively unreasonable." *Id.*

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the
state court's decision "was based on an unreasonable determination of the facts in light of
the evidence presented in the State court proceeding." A determination of a factual issue
made by a state court, however, shall be presumed correct, and the habeas petitioner shall
have the burden of rebutting the presumption of correctness by clear and convincing
evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

**B.     Standard for Ineffective Assistance of Counsel**

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984),
established a two-part test for determining whether a convicted person is entitled to relief
on the ground that his counsel rendered ineffective assistance: (1) whether counsel's
performance was deficient and "fell below an objective standard of reasonableness"; and
(2) whether the deficient performance prejudiced the defense.[3] *Id.* at 687-88. A court must
adhere to a strong presumption that counsel's conduct falls within the wide range of
reasonable professional assistance. *Id.* at 689-90. "Thus, a court deciding an actual

---

[3]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court
clarified that the prejudice prong of the test does not focus solely on mere outcome
determination; rather, to establish prejudice, a criminal defendant must show that counsel's
deficient representation rendered the result of the trial fundamentally unfair or unreliable.

10

ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir.), *cert. denied*, 493 U.S. 945 (1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted), *cert. denied*, 514 U.S. 1131 (1995). Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

## IV.   MERITS OF THE PETITION

### A.   Claim I

Petitioner contends that his conviction for first-degree murder violates the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution because the evidence was legally insufficient to support the guilty verdict. According to Petitioner, the evidence presented at trial was entirely circumstantial and failed "to exclude the reasonable possibility that someone other than [Petitioner] killed Denise Collins." (Doc. No. 1 at 3.)

In making this claim, Petitioner cites to four areas of circumstantial evidence he contends were insufficient to prove that he caused the victim's death: hair comparison evidence, the ladder impression, DNA evidence, and the proximity of Petitioner to the victim's apartment.  (Doc. No. 8 at 14.)  Petitioner raised these issues on direct appeal, and the Florida Supreme Court ruled against him.  In particular, the Florida Court stated:

> We have conducted an independent review of the entire record before us, and find competent and substantial evidence to support the juries' verdict and sentence.  We therefore reject Kimbrough's contention in issue 1 that the evidence at trial was legally insufficient to support the verdict . . . .

*Kimbrough*, 700 So. 2d at 636.  In so holding, the Florida Court expressly found that the trial court did not abuse its discretion in admitting the DNA evidence and that the circumstances surrounding the killing supported either premeditation or felony murder. *Id*. at 636-37.

To satisfy the constitutional requirement of due process in a criminal trial, the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant.  *In re Winship*, 397 U.S. 358, 364 (1970).  When reviewing the sufficiency of the evidence under the AEDPA standard, the limited inquiry is whether it is objectively reasonable to conclude the evidence presented, viewed in a light most favorable to the State, would have permitted any rational trier of fact to find the petitioner guilty of the crime charged beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Johnson v. Alabama*, 256 F.3d 1156, 1172 (11th Cir. 2001).

Although on habeas review, the State must show that each element of the offense was established beyond a reasonable doubt, *Bishop v. Kelso*, 914 F.2d 1468, 1470 (11th Cir.1990) (citing *Jackson*, 443 U.S. at 316), the State is not required to rule out every hypothesis except that of the guilt of the defendant. *Jackson*, 443 U.S. at 326.  The federal court will not reweigh the evidence.  *Id*. at 319.  The trier of fact is responsible for fairly resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts.  *Id*.  Although the facts as they exist in the record may support opposing inferences, a federal habeas corpus court must presume that the state trial court jury resolved such conflicts in favor of the prosecution and against the petitioner.  *See Heath v. Jones*, 863 F.2d 815, 820 (11th Cir. 1989); *Machin v. Wainwright*, 758 F.2d 1431, 1435 (11th Cir. 1985).   In other words, the federal courts must defer to the judgment of the jury in assigning credibility to the witnesses and weighing the evidence. *Heath*, 863 F.2d at 820 (citing *Jackson*, 443 U.S. at 326).

The State introduced considerable evidence linking Petitioner to the murder of Denise Collins.  An eyewitness put Petitioner in the vicinity of the victim's apartment within hours of the crime.  Three pubic hairs matching Petitioner were found on the victim's blood-stained sheet and one was found on one of her towels.  Semen stains found on the victim's sheets matched Petitioner.  Based on the evidence introduced at trial, it is objectively reasonable to conclude that the evidence was sufficient to establish that Petitioner was guilty of committing the murder for which he was convicted.  Accordingly,

the state court decision resulted in a reasonable application of *Jackson* and its progeny.

Claim one does not warrant habeas corpus relief.

**B.     Claim II**

Petitioner argues that the state trial court erred by prohibiting the defense from introducing testimony about other crimes, wrongs, or bad acts committed by another person.  At trial, Petitioner sought to present evidence that Gary Boodhoo, the victim's former boyfriend, had beaten her when they lived together in Boston a year earlier.  This evidence was intended to support the defense's theory that Mr. Boodhoo, who was with the victim and two other friends the night of the murder, was a spurned ex–boyfriend who had the motive and opportunity to commit the murder.  Petitioner claimed that in addition to having a key to the victim's apartment, Mr. Boodhoo voice had been heard several days before the murder outside the victim's apartment window, along  with the scraping noise from a metal ladder.

Finding that it was not relevant or similar enough, the state trial court granted the State's motion in limine and prohibited the admission of the evidence regarding Mr. Boodhoo's treatment of the victim.  (Ex. A-18 at 90-91.)  On direct appeal, Petitioner claimed that the trial court's decision was erroneous under Florida law.  The Florida Supreme Court disagreed, finding that the trial court did not abuse its discretion. *Kimbrough*, 700 So. 2d at 637.

"Federal habeas corpus relief based on evidentiary rulings will not be granted unless it goes to the fundamental fairness of the trial."  *McCoy v. Newsome*, 953 F.2d 1252, 1265

14

(11th Cir.), *cert. denied*, 504 U.S. 944 (1992); *see also Tejada v. Dugger*, 941 F.2d 1551, 1560 (11th Cir. 1991), *cert. denied*, 502 U.S. 1105 (1992) ("We review questions of state law in federal habeas proceedings only to determine whether the alleged errors were so critical or important to the outcome of the trial to render 'the entire trial fundamentally unfair.'"). The state trial error must have been "material in the sense of a crucial, critical, highly significant factor." *Tejada*, 941 F.2d at 1560 (quotation omitted) (citations omitted); *see also Shaw v. Boney*, 695 F.2d 528, 530 (11th Cir. 1983) (generally, a federal court will not review a state trial judge's ruling with respect to the admissibility of evidence; an erroneous ruling alone does not warrant habeas corpus relief); *Palmariello v. Superintendent of M.C.I. Norfolk*, 873 F.2d 491, 494 (1st Cir.) ("Habeas review does not ordinarily encompass garden variety evidentiary rulings."), *cert. denied*, 493 U.S. 865 (1989).

In the present case, Petitioner has not demonstrated that the evidentiary ruling made by the trial court with regard to this matter was erroneous or deprived him of a fundamentally fair trial.  As noted by the state trial court, the evidence the defense sought to introduce was neither relevant nor similar to the circumstances of the murder.  First, the incident occurred over a year prior to the murder while Mr. Boodhoo and the victim were living together.  (Ex. A-18 at 59, 61.)  Second, the brutality of the murder far exceeded the circumstances of the incident in Boston.  In fact, the record reflects that Mr. Boodhoo withdrew from the confrontation and locked himself in the bathroom.  The victim was then more concerned that Mr. Boodhoo would harm himself than that he would hurt her.  (Ex. A-18 at 60-61, 79-88.)  Also, there was no indication that a sexual assault occurred in

connection with the earlier incident.  (Ex. A-18 at 86.)  The omission of this evidence did not render Petitioner's trial fundamentally unfair or infringe on his constitutional rights.

Moreover, Petitioner has failed to establish that the alleged errors by the trial court with regard to these matters had a "substantial and injurious effect or influence in determining the [jury's] verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993) (the petitioner must demonstrate that the "trial error" had a substantial and injurious effect or influence in determining the jury's verdict).  A review of the record reveals that an eyewitness placed Petitioner in the vicinity of the victim's apartment shortly before the crimes and his pubic hairs and DNA were found at the scene of the murder.  This evidence was adequate to convict Petitioner.  Furthermore, the record reflects that Mr. Boodhoo voluntarily submitted his DNA and was positively excluded as having left the blood or DNA at the scene of the crimes.  (Ex. A-18 at 52-53.)

## C.    Claim III

In his third claim, Petitioner contends that the state trial court abused its discretion by not finding the statutory mitigator of age at the time of the offense.  According to Petitioner, he was nineteen years old at the time of the offense, but the trial court declined to find this statutory mitigator because the defense did not show that Petitioner was "impaired" in any way and the fact that he did not finish high school did not necessarily indicate a lack of maturity or an appreciation of the crime.[4]  Petitioner raised this claim on

---

[4]Although the trial court specifically found that the mitigating circumstance of age did not exist, it also stated that "even if this mitigator did exist and were given any weight,
(continued...)

16

direct appeal, and the Florida Supreme Court expressly found that the trial court did not abuse its discretion.  *Kimbrough*, 700 So. 2d at 637-38.

This claim involves only issues of state law, namely the exercise of the trial court's discretion in determining the application of a statutory mitigating factor.[5]  This Court expresses no opinion on the state trial court's interpretation of Florida law.  A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved.  *See Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir. 1983); *Llamas-Almaguer v. Wainwright*, 666 F.2d 191 (5th Cir. 1982).  "This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is 'couched in terms of equal protection and due process.'"  *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988) (quoting *Willeford v. Estelle*, 538 F.2d 1194, 1196-98 (5th Cir. 1976)).  Because this claim is based exclusively on state law matters, it must be denied.

## D.    Claim IV

Petitioner avers that his death sentence is disproportionate in contravention of the Sixth, Eighth, and Fourteenth Amendments and that the state trial court improperly weighed the mitigating circumstances.  Although he acknowledges that the trial court

---

[4](...continued)
it would not change the balance between the aggravating and mitigating circumstances."
(Ex. A-24 at 597-98.)

[5]The Court specifically notes that Petitioner has cited no federal constitutional provision or federal law in support of his claim.  Furthermore, a review of the record reflects that the claim raised on direct appeal relied solely on state law.

found three aggravating circumstances,[6] Petitioner essentially argues that two of the aggravators (during the commission of a felony and heinous, atrocious, or cruel) were improperly found.   Having summarily discarded two of the aggravators, Petitioner declares the prior violent felony to be "not especially compelling." (Doc. No. 1 at 10.)  He further contends that this Court should, unlike the state courts, consider the statutory mitigator of age, as well as all evidence of non-statutory mitigating circumstances presented at the penalty phase, to find that the death penalty is inappropriate.

Petitioner raised this claim on direct appeal.  The Supreme Court of Florida rejected the claim as follows:

> There are three aggravators present: prior violent felony, committed during the course of a felony, and HAC.  There was no statutory mitigation and weak nonstatutory mitigation.   Kimbrough's death sentence is not disproportionate to other similar cases.  *See, e.g., Geralds v. State,* 674 So. 2d 96 (Fla. 1996) (upholding the death sentence where there were two aggravators and weak mitigation); *Taylor v. State,* 630 So. 2d 1038 (Fla. 1993) (upholding the death sentence where there were three aggravators and evidence of mental retardation in mitigation).  This issue is without merit.

*Kimbrough,* 700 So. 2d at 638.

The Eleventh Circuit Court of Appeals has held:

> A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, "get out the record" to see if the state court's findings of fact, their conclusion based on a review of similar

_____

[6]The trial judge cited to three aggravating circumstances in support of the death sentence: (1) the defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person; (2) the capital felony was committed while the defendant was engaged in the commission of an attempt to commit or committing a sexual battery; and (3) the capital felony was especially heinous, atrocious, or cruel.  (Ex. A-24 at 596-97.)

cases, was supported by the "evidence" in the similar cases. To do so would thrust the federal judiciary into the substantive policy making area of the state.

*Moore v. Balkcom*, 716 F.2d 1511, 1518 (11th Cir. 1983). In considering this claim, the Supreme Court of Florida conducted a proportionality analysis and determined that no resentencing was warranted. This procedure was not done arbitrarily or capriciously and provided an adequate safeguard of Petitioner's rights. This Court does not have the authority to infringe on the state court's determination. *See Bush v. Singletary*, 99 F.3d 373 (11th Cir. 1996) (finding that proportionality review based on the vacating of a co-defendant's death sentence was not required by the United States Constitution); *see also United States ex rel. Thomas v. Haws*, No. 97 C 7992, 2002 WL 199778, at *4 (N.D. Ill. February 7, 2002) (stating that the petitioner's "complaint concerning the alleged disparity between his sentence and that of his co-defendant is not a basis for habeas relief").

Even if this claim was subject to federal habeas review, the state court's decision does not run afoul of § 2254(d). In support of his argument that his death sentence should have been vacated as disproportionate, Petitioner cites four Florida Supreme Court cases in which death sentences were vacated. Each of the cases is easily distinguished from the facts of the instant case.

In *Caruthers v. State*, 465 So. 2d 496 (Fla. 1985), the defendant shot a clerk while robbing a convenience store. *Id.* at 498. In imposing the death penalty, the trial court found three aggravating factors, one statutory mitigating circumstance (no significant criminal history), and several nonstatutory mitigating circumstances. *Id.* The Florida Supreme

Court struck two of the aggravators, leaving only one (the murder was committed during the commission of an armed robbery). *Id*. at 498-99. In conducting a proportionality review, the Florida Supreme Court specifically found that death was not appropriate in the *Caruthers* case. *Id*. at 499.

In *Lloyd v. State*, 524 So. 2d 396 (Fla. 1988), the defendant was convicted of shooting and killing a twenty-eight year old woman in her home in front of her five-year old son. *Id*. at 397-98. Based on three aggravating factors and one statutory mitigator (no significant criminal history), the state trial court sentenced the defendant to death. *Id*. at 398. On direct appeal, two of the aggravators were stricken, leaving only one aggravator (the murder was committed during the course of an attempted robbery) to support the death sentence. *Id*. at 402-03. The Florida Supreme Court vacated the death sentence, finding that it was proportionately incorrect. *Id*. at 403.

In *Rembert v. State*, 445 So. 2d 337 (Fla. 1984), the defendant hit an elderly victim on the head once or twice with a club and took money from the cash drawer at the victim's bait shop. *Id*. at 338. In imposing the death penalty, the trial court found four aggravating factors and no mitigating evidence of any kind. The appellate court struck three of the aggravators, leaving one aggravator (the murder was committed during the commission of a felony) and no mitigators. *Id*. at 340. After the State conceded at oral argument that in similar circumstances defendants had received less severe sentences, the Florida Supreme Court vacated the death sentence as unwarranted. *Id*.

In the final case upon which Petitioner relies, the defendant murdered the occupant of the house he burglarized. *Proffitt v. State*, 510 So. 2d 896 (Fla. 1987). The victim was stabbed once in the chest while lying in bed. The defendant immediately fled the apartment, returned home, confessed to his wife, and voluntarily surrendered to authorities. *Id.* at 898. The trial court sentenced the defendant to death, finding two aggravating factors (the murder was committed during the commission of a felony and was committed in a cold, calculated, and premeditated manner), one statutory mitigator (no significant criminal history), and several nonstatutory mitigators. In overturning the death sentence, the Florida Supreme Court specifically noted that allowing the death sentence to stand would "mean that every murder during the course of a burglary justifies the imposition of the death penalty." *Id.*

All four of these cases are factually distinguishable from the instant case. First, unlike Petitioner, none of the four defendants had a prior violent felony conviction. In this case, Petitioner had prior convictions for burglary of a dwelling with a battery and sexual battery. Next, none of the murders committed in the four cited cases even approaches the brutality and viciousness of the instant murder. Two of the cases involved shootings (*Caruthers* and *Lloyd*), one involved one or two strikes with a club (*Rembert*), and the final case involved a single stabbing to the chest (*Proffitt*). In contrast, Petitioner brutally raped and beat his victim:

> On October 3, 1991, the Defendant entered the second-story apartment of the victim, Denise Collins, as she lay in bed alone late at night. The victim was a 28-year old female, 5 feet 4 inches tall, 112 pounds who lived in that

apartment alone.  The evidence indicates that the Defendant used a ladder to climb onto the balcony and get through the sliding glass door.  He raped Ms. Collins.  She had contusions on her upper arms and left side of face.  The evidence presented by the Medical Examiner, Dr. Thomas Hegert, was that there was a minimum of three blows to the head, one of which would have rendered her unconscious.  Her skull was fractured by a blunt force.  There was blood on the wall as well as the bed, the carpet, and numerous items strewn throughout the room indicating a struggle.  The Medical Examiner could not say in what sequence the blows to her head were inflicted, but that the one that fractured her skull would have rendered her unconscious.  If she were rendered unconscious immediately, perhaps this crime would not be so hideous.  The Medical Examiner, naturally, cannot determine which blow was first because they were all too close in time; however, there is other evidence that this crime involved quite a struggle.  There was blood all over the room.  The victim was still alive when she was found by the paramedics on the floor.  She even sat up at one point when law enforcement was there.  She regurgitated.  Heroic efforts were made to save her life; however, she died at the hospital about 12 hours after the attack.  There was semen found on the bottom sheet of Ms. Collins' bed.  It was matched to the Defendant through DNA.

The last moments of Denise Collins life were a nightmare.  First, she discovered a stranger in her bedroom, then she was raped by that stranger.  After that she was beaten, and her head was banged against the wall.  She had to be in unspeakable fear and pain.  Although no exact time period over which this hideous crime occurred has been established, based on the activities that took place and the extent of blood splattered throughout the room it was not quick.

(Ex. A-24 at 596-97.)

Clearly, the Florida Supreme Court's determination that Petitioner's death sentence was not disproportionate was neither contrary to, nor an unreasonable application of, federal law.  Moreover, the decision did not rest upon an unreasonable determination of the facts.  Under § 2254(d), federal habeas relief is not warranted for this claim.

**E.     Claim V**

Petitioner maintains that his constitutional rights were violated when the trial court instructed the jury on the aggravating circumstance of especially heinous, atrocious, or cruel ("HAC").  In addition, Petitioner ascribes constitutional error to the trial court's determination that such an aggravator applied to his case.  According to Petitioner, it was not proven beyond a reasonable doubt that the victim was aware of her impending death, suffered any pain, or was raped before she was beaten.  Instead, Petitioner argues that "[i]t is fair to conclude due to the lack of evidence that Denise Collins lost consciousness immediately upon being attacked."  (Doc. No. 1 at 13-14.)

At the penalty phase, the trial judge only instructed the jury on the aggravating circumstances which she believed were supported by the evidence.[7]  Since it is Petitioner's contention that the HAC aggravator was not supported by the evidence, he further avers that instructing the jury on this particular factor "violated the Eighth Amendment, in that the presence of that legally improper instruction was confusing and misleading to the jury concerning their recommendation of the appropriate sanction."  (Doc. No. 1 at 14.)

---

[7]As to the HAC aggravator, the jury was instructed as follows:

Heinous means extremely wicked or shockingly evil.  Atrocious being outrageously wicked and vile.  Cruel means to inflict high degree of pain with utter indifference to or enjoyment of the suffering of others.

The kind of crime intended to be included as heinous, atrocious or cruel is one accompanied by additional facts that show that the crime was conscious less [sic] or pitiless and was unnecessarily torturous to the victim.

(Ex. A-10 at 561.)

The trial court entered a Judgment and Sentence in which it found that the HAC aggravating circumstance had been proved beyond all reasonable doubt.  As set forth in connection with claim IV, the  trial court found, among other matters, that the victim suffered at a minimum three blows to the head, one of which fractured her skull and would have rendered her unconscious.  Based on the blood on the wall, bed, and carpet and the items strewn throughout the room, the trial court found that "this crime involved quite a struggle."  In addition, the victim was still alive when found by the paramedics and, in fact, sat up and regurgitated at one point.  This evidence, coupled with the rape of the victim, was found by the trial court to prove the HAC aggravator beyond a reasonable doubt.  (Ex. A-24 at 596-97.)  On direct appeal, the Supreme Court of Florida agreed with the trial court's conclusion that the facts demonstrated the murder was committed in a heinous, atrocious, or cruel manner.  *Kimbrough*, 700 So. 2d at 638.

This Court agrees with the conclusion of the state courts.  Although the medical examiner was unable to conclusively establish a timeline for the blows to the victim's head, the trial court's thorough analysis establishes that "the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies - the conscienceless or pitiless crime which is unnecessarily torturous to the victim."  *State v. Dixon*, 283 So. 2d 1, 9 (Fla. 1973), *cert. denied*, *Hunter v. Florida*, 416 U.S. 943 (1974).  Additionally, in considering this claim, the Supreme Court of Florida did not apply a rule that contradicted the governing law set forth in the cases of the United States Supreme Court.  There is no indication that the result reached by the state court was at

odds with any United States Supreme Court case which considered "materially indistinguishable facts." Finally, the state court's application of the clearly established law regarding this claim was objectively reasonable.[8]

## F.      Claim VI

Petitioner contends that the state trial court violated his Sixth and Fourteenth Amendment rights by excusing for cause a qualified juror over defense objection. According to Petitioner, the State did not meet its burden to establish exclusion of potential juror Linda Alexander.

Ms. Alexander knew an individual who had been sentenced to death, and the father of one of her children had been prosecuted for first-degree murder in Orange County, Florida. During voir dire, she indicated that she would find it difficult to sit on a death case and that she could not be fair and impartial due to her personal relationship with the individuals who had been involved in the death penalty process. However, when pressed by defense counsel, Ms. Alexander finally indicated that she could follow the law and serve on the jury. Despite Ms. Alexander's acquiescence upon questioning by defense counsel,

---

[8]Because the evidence clearly supported the application of the HAC aggravator, Petitioner's claim that his constitutional rights were violated merely by the giving of the standard jury instruction on this circumstance necessarily must fail. Moreover, Petitioner simply has not shown that the instruction was in any manner invalid at the time it was provided to the jury. It appears from the record that the trial court used standard jury instructions which the Supreme Court of Florida has consistently upheld against constitutional vagueness challenges. *See Johnson v. State*, 660 So. 2d 637 (Fla. 1995), *cert. denied*, 517 U.S. 1159 (1996); *Preston v. State*, 607 So. 2d 404, 410 (Fla. 1992).

the state trial judge found that Ms. Alexander's overall questioning left reasonable doubt as to whether she could follow the law.  Thus, she was excused for cause.

On direct appeal, Petitioner asserted that Ms. Alexander's excusal violated his Sixth and Fourteenth Amendment rights.  Stating that a prospective juror may be excused for cause if his or her views "would prevent or substantially impair the performance of his or her duties as a juror in accordance with the juror's instructions and oath," the Florida Supreme Court rejected this claim.  *Kimbrough*, 700 So. 2d at 638-39.

Consideration of this claim requires a review of the entire voir dire examination of Ms. Alexander:

> MR. ASHTON:      Miss Alexander, first thing I want to ask you about is you mention in your questionnaire you have a friend that's on death row?
>
> JUROR:      Was.
>
> MR. ASHTON:      What was his name?
>
> JUROR:      Henry Dupree.
>
> MR. ASHTON:      Okay.  I think I remember that name.  He was from Orange County?
>
> JUROR:      Yes.
>
> MR. ASHTON:      Do you think that that fact would make it difficult for to you [sic] sit on a case where the death penalty is the issue?
>
> JUROR:      Yes.
>
> MR. ASHTON:      Do you feel that your friendship with this individual would you be able to recommend death penalty for someone?

26

JUROR:        It's hard to say really.

MR. ASHTON:        What – can you kind of think that through with me a little bit?  How do you feel about that?

JUROR:        I have a boyfriend that's serving time now and it's real hard to really say, you know.

MR. ASHTON:        Okay.  How do you feel abut the idea of being a juror in a death penalty case?

JUROR:        Not too good.

MR. ASHTON:        Okay.    Do  you  think  that  sometimes  death penalty is appropriate:

JUROR:        Yes.

MR. ASHTON:        Do you think that you personally could impose the death penalty on someone else if you thought the facts and the law called for it?

JUROR:        Maybe.

MR. ASHTON:        Is there a probability there will – you might not be able to impose the death penalty regardless of the facts and circumstances and the law.

JUROR:        Yes.

MR. ASHTON:        That's a probability, too?

JUROR:        Right.

MR. ASHTON:        Was the person on death row a friend of yours.

JUROR:        Schoolmate.

MR. ASHTON:        Did you feel like he didn't belong there?

JUROR:        Well, not really.  It's just point of knowing the person.

MR. ASHTON:        Your relationship with Mr. Dupree, Henry James Dupree?

JUROR:        Yes.

MR. ASHTON:        Would your relationship with him make it very difficult for you to follow the law in the area of the death penalty and vote to recommend death if that's what law called for?

JUROR:        Well, see, like I said, I have my oldest child's father he was recommended to death row or twenty-five years in prison and he still serving twenty-five years in prison now.

MR. ASHTON:        What his name.

JUROR:        Samuel Lee Montgomery.

MR. ASHTON:        So you know two people been prosecuted for first degree murder in Orange County?

JUROR:        Yes.

MR. ASHTON:        They both here in Orange County, right?

JUROR:        Right.

MR. ASHTON:        Do you feel like you at this point can be completely fair and impartial in judging issues of the death penalty in Orange County having had a personal relationship with people who were in that relationship?

JUROR:        No. No.

MR. ASHTON:        You don't think you can?

JUROR:        No.

MR. ASHTON:        Okay.  I don't have any other questions for you. Defense may have.

MS. CASHMAN:   The judge is going to give you a list of instructions at the end and they will explain aggravating circumstances and mitigating circumstances.  And if you were chosen as a juror you would have to go back and deliberate and based on the law decide what the appropriate sentence would be.

If the appropriate sentence was death, based upon what the facts of this case are and, you know, I mean – and you're here to listen to the facts of Mark's case and you would have to set aside whatever you know about Mr. [sic] Alexander, whatever you know about anyone else and just died [sic] on Mark's case and the factors in this case, the facts of this crime and whatever mitigation that you hear.  I know that it would be really tough for you and you probably tougher then the other jurors that are standing in the hall right now, but if you were chosen on this jury and you took the oath could you follow the judge's instructions and if it was appropriately difficult, though it might be, could you vote for the death sentence?  And I know it's a real tough question and take minute if you need to think.  We would need you to follow the oath that you took as a juror and decide sentence in Mark's case just based on his case and putting aside all the other things going on in your life.

Can you do that for us?

JUROR:      Maybe.

MS. CASHMAN:     Maybe. Okay. It's one of those yes no questions. You don't get to say maybe.  I know that.

THE COURT:        You can't push her for a definite answer.  She's uncertain.  She's uncertain.  And we can't make her tell us something she doesn't need --

MS. CASHMAN:    Can you imagine yourself voting life in a first degree murder case?  Judge instructed you earlier Mark's been convicted of first degree murder, burglary and is that okay?  That's a done issue.

And only reason you have been called here as juror is because we're at the sentencing portion of the trial.  He's been convicted back in July.  It's not for you to determine.

Can you, after listening to all the evidence, imagine a situation you would vote to impose the death sentence?

JUROR:        Well, personally it's still hard to for me to really.

MS. CASHMAN:       I think – I know it's hard. I know I'm putting you on the spot.  The State needs to make sure that this is a fair trial and I need to make sure that Mark gets a fair trial and that's why I'm pushing you for an answer and why we need to know if you can be fair.  Knowing that it would be difficult and knowing those personal facts about you, can you follow the law as the judge instructs you at the end of this case if you were chosen as a juror?

JUROR:        Yes.

MS. CASHMAN:       Can you tell us that?

JUROR:        Yes.

MS. CASHMAN:       Thank you, Miss Alexander.

THE COURT:        Any other question?

MR. ASHTON:        No, Your Honor.

THE COURT:        Wait out in the hall just a minute Miss Alexander.

(Juror exits the Courtroom)

THE COURT:        Any challenges for cause?

MR. ASHTON:        Yes, Your Honor.  We would move to challenge for cause.

MR. SIMS:     We would object.  At the end she said she could follow the law, Your Honor.

MR. ASHTON:        Question isn't what she said at the end.  It's what she said during the entire examination.  She had a personal relationship prosecuted in Orange County for first degree murder.

30

THE COURT:          One of them is the father of her child.

MR. ASHTON:          Other than on anything else it's caused her ambivalence at best on the issue of having been asked maybe four times until Miss Cashman asked the same question a fifth time and finally until she said yes doesn't qualify her and qualification have to appear beyond reasonable doubt.  There's certainly reasonable doubt as to her inability to follow the law.

THE COURT:          I tend to agree with that.  She's – all the way through known two people.  One already put to death, other one sitting on this twenty-five year minimum mandatory.  I'm going to strike her for cause.  Tell her she need not come back tomorrow . . . .

(Ex. A-7 at 97-104.)

In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the United States Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding venire men for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."  *Id*. at 522. The Court subsequently attempted to refine the standard and alleviate confusion in the lower courts in *Wainwright v. Witt*, 469 U.S. 412 (1985).   In revisiting the issue of what degree of deference a federal court in a habeas corpus proceeding should pay a state court's excusal of prospective jurors for their views opposing capital punishment, the *Witt* Court held that the standard is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Id*. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).  The Court added that this standard does not require that the "juror's bias be proved with 'unmistakable clarity.'"  *Id*.  Noting that assessments of demeanor and

31

credibility are "peculiarly within a trial judge's province," the Court also decided that the trial court's determination on this issue is a factual finding deserving deference on habeas review. *Id*. at 428-29.

Applying this standard, the trial court did not constitutionally err in excusing Ms. Alexander. Although at the end she said that she could do her duty as a juror, her testimony viewed in its entirety supports the trial court's excusal. Before defense counsel elicited the positive response, Ms. Alexander at least twice expressed reservations about whether she could recommend a death sentence, twice stated that she could not be fair and impartial, and once indicated that she might not be able to impose the death penalty regardless of the facts and law. This testimony sufficiently demonstrates that her views would prevent or substantially impair her ability to impose the death penalty.

The assessments of jurors' states of mind are "based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province" and are therefore entitled to deference on habeas review. *Witt*, 469 U.S. at 428. The testimony of Ms. Alexander satisfied the trial court that she should be struck for cause. Applying the standard articulated in *Witt*, the trial court's excusal of Ms. Alexander did not run afoul of constitutional jurisprudence. Given that the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law and Petitioner has not impugned that court's factual findings, § 2254(d) precludes this Court from granting relief on claim VI.

**G.    Claim VII**

According to Petitioner, the state trial court erred in finding, as an aggravating circumstance, that the murder was committed during the course of a sexual battery.  He contends that "two key areas of proof [were] missing: one, that the sexual activity, if any, was non-consensual; two, the sexual activity tied to Petitioner through the DNA testing occurred during the course of the fatal beating."  (Doc. No. 1 at 19.)

Petitioner challenged the application of this aggravator on direct appeal.  The Supreme Court of Florida found that there was "ample evidence that the sexual activity evidenced through the DNA samples was nonconsensual." *Kimbrough*, 700 So. 2d at 639. In addition, the appellate court noted that the "battery and the murder were clearly part of the same criminal episode." *Id*.  Concluding that competent and substantial evidence supported the aggravator, the Supreme Court of Florida rejected this claim.

This Court agrees with the Supreme Court of Florida.  In determining that this aggravator applied, the state sentencing judge made specific findings as follows:

> Denise Collins was brutally raped in her bed in the middle of the night by the Defendant.  The DNA evidence matched that of the Defendant.  The bruises on her arms are indicative of being held down.  The evidence presented was that the victim and [D]efendant did not know each other and that the Defendant gained entry into her apartment through the sliding glass door of her second-story apartment balcony.
>
> This aggravating circumstance was proved beyond a reasonable doubt.

(Ex. A-24 at 596.)  The victim's bruises, the use of the ladder to gain entry to the victim's apartment in the middle of the night, the evidence of a struggle, and the vaginal injuries

all clearly support the conclusion that a sexual battery occurred during the same criminal episode as the murder.  Claim seven is utterly devoid of merit.

## H.    Claim VIII

Petitioner challenges Florida's death penalty statute as unconstitutional on a litany of grounds: (a) the jury instructions on the HAC aggravator and felony murder violate the Eighth Amendment and the Due Process Clause; (b) the statute authorizes a death verdict on the basis of a bare majority vote in violation of the Eighth Amendment and the Due Process Clause; (c) aggravating circumstances are made into elements of the crime but do not require unanimous verdicts, thus violating the Fifth, Sixth, Eighth, and Fourteenth Amendments; (d) the jury is told that its recommendation is advisory in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985); (e) the State fails to provide adequate counsel in capital cases; (f) the trial judge has an ambiguous role in Florida's capital punishment system; (g) judges, who ultimately render the sentence, are selected by a system designed to exclude African-Americans from participation as circuit judges, "contrary to the Equal Protection of the laws, the right to vote, Due Process of law, the prohibition against slavery, and the prohibition against cruel and unusual punishment" (Doc. No. 8 at 61); (h) appellate review of death sentences is inadequate; (i) the statute does not provide for special verdicts regarding the jury's decisions on aggravators, mitigators, felony murder, or premeditated murder; (j) Florida law forbids mitigation of a death sentence; (k) Florida law creates a presumption of death where a single aggravator appears; (l) Florida unconstitutionally

34

instructs juries not to consider sympathy; and (m) death by electrocution is cruel and unusual.

This claim was raised on direct appeal. The Supreme Court of Florida stated that the claim had no merit and rejected it without discussion. *Kimbrough*, 700 So. 2d at 639.

Petitioner has not advanced any reason as to why this statute is unconstitutional. The Supreme Court of Florida has repeatedly upheld its constitutionality. *See, e.g., Pittman v. State*, 646 So. 2d 167 (Fla. 1994), *cert. denied*, 514 U.S. 1119 (1995).

Moreover, Petitioner's claim is precluded by section 2254(d). In considering this claim, the Supreme Court of Florida did not apply a rule that contradicted the governing law set forth in the cases of the United States Supreme Court. Furthermore, there is no indication that the result reached by the state court was at odds with any United States Supreme Court case which considered "materially indistinguishable facts." Finally, the state court's application of the clearly established law regarding these issues was objectively reasonable.

## I.     Claim IX

Petitioner argues that the Rule 3.850 court erred in denying relief on his *Ake v. Oklahoma*, 470 U.S. 68 (1985), claim.[9] According to Petitioner, "his trial counsel failed to

---

[9]Under *Ake v. Oklahoma*,  470 U.S. 68, 83 (1985), "the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." The Supreme Court emphasized that assisting in the preparation of a defense includes, but is not limited to, the following: 1) examining the defendant; 2) testifying on his behalf; 3) helping determine the viability of an insanity defense; and 4) assisting in the preparation (continued...)

prepare a competent mental health professional to evaluate Mr. Kimbrough and, as a

result, Mr. Kimbrough was denied his right to adequate mental health assistance." (Doc.

No. 1 at 22.)  This claim also alleges that trial counsel was ineffective for not using the

psychologists who examined Petitioner for statutory mental health matters and for failing

to investigate and present evidence of mental health mitigation during the penalty phase.

In particular, Petitioner ascribes error to the following matters:

> (a)  Mr. Sims failed to recognize the "prospective rule announced in *Koon v. Dugger*, 619 So. 2d 246, 250 (Fla. 1993), requiring a court to have a defendant confirm on the record the discussion with counsel of mitigation matters and the defendant's wishes to waive presentation when such is the case." (Doc. No. 1 at 22-23.)

> (b)  Mr. Sims made a unilateral and ill-informed decision not to present any mental health experts; thus, eliminating from consideration an abundance of mitigation information. (Doc. No. 1 at 26.)

> (c)  Trial counsel failed to have Dr. Berland investigate or develop the issue of brain damage. (Doc. No. 1 at 26.)

> (d)  Ms. Cashman made "an egregious error when she misunderstood and misinterpreted her psychologist as referring to 'psychopathic deviant.'" (Doc. No. 8 at 76.)

Petitioner raised this claim in his Rule 3.850 motion. (Ex. C-20 at 1520-21.)  After

conducting an evidentiary hearing on the matter, the state trial court entered a detailed

order summarizing the relevant testimony and denying the claim. (Ex. C-23 at 2188-96.)

The trial court specifically found that counsel's decision not to call either of the two mental

health experts as witnesses was "a reasonable trial tactic"; that Petitioner failed to meet his

---

[9](...continued)
of the cross-examination of the State's psychiatric witnesses. *Id*. at 82.

burden of demonstrating that counsel failed to provide the experts with sufficient background material to conduct a proper evaluation; that no evidence was presented to support the existence of the litany of potential mitigating factors espoused by Petitioner's expert at the evidentiary hearing or to establish the weight such factors would have had during the penalty phase; and that such mitigators "would not have made a difference in the outcome of the penalty phase proceedings by outweighing the aggravating factors which were established." *Id*. at 2193-96.

Petitioner challenged the trial court's decision on appeal arguing that trial counsel made "egregious error-filled decisions not to use their psychologists for statutory mental health matters and there was an abysmal failure to establish a theme in Mr. Kimbrough's defense with the abundance of available non-statutory mitigation." (Ex. C-27 at 25-26.)  In rejecting Petitioner's arguments, the Florida Supreme Court entered a thorough, detailed order recounting all the relevant testimony from the evidentiary hearing, as follows:

*Testimony of Defense Counsel*

Kimbrough was represented at trial by two attorneys, Patricia Cashman and Kelly Sims. Both Sims and Cashman are very experienced in capital cases. Cashman testified that Dr. Eric Mings, a forensic criminal psychologist, was retained to conduct a psychological evaluation of Kimbrough and was originally listed as a defense witness.  On February 11, 1994, prior to trial, Cashman filed a notice striking Mings from the witness list.  Mings was removed from the list quickly so that the State could not depose him. Although she could not recall all of the reasons she had for striking Mings from the witness list, she stated that one of the reasons she struck Mings was because of the things Mings said about Kimbrough being a "psychopathic deviant" and the fact that she thought such testimony would hurt him in front of the jury.  Cashman testified that the decision not to call Mings was a joint decision, made by her and Sims, and stated that before making such

37

a decision she would have asked Mings whether he thought he could be helpful as a witness.

At the hearing, Cashman reviewed a note she wrote while preparing for the Kimbrough trial.  The note reflected that Kimbrough denied having any problems, had relatives in Tennessee, was raised by his stepfather, and had no history of abuse.  The "worst thing that happened to him" was that his cousin was killed at the age of sixteen.  Kimbrough won talent show trophies for singing and had an intelligence quotient (IQ) of seventy-six, which was in the fifth percentile on the Wechsler Adult Intelligence Scale test (WAIS).  He had an MMPI (Minnesota Multiphasic Personality Inventory) which was valid, but defensive.  The note also stated that there was a spike on "scale four, psychopathic deviant[FN6] endorsing items consistent with family discord, other scales normal."  She did not recall what exactly Mings told her about the psychopathic deviate scale.

> FN6.  Although the note referred to "psychopathic deviant," the note apparently referred to a spike on the "psychopathic deviate scale," one of the scales in the MMPI.  There was some evidence that Cashman confused the name of the scale with an actual diagnosis that Kimbrough was a psychopathic deviant.

Cashman had defended a number of cases prosecuted by Jeff Ashton, the prosecutor in this case, and was familiar with him and his trial tactics.  She stated that Ashton liked to use a spike on scale four of the MMPI "[t]o make my client look really dangerous and make the jury scared of him and want to kill him."

In addition to Mings, Cashman retained Dr. Robert Berland, a forensic psychologist, to conduct a pretrial evaluation of Kimbrough.  Cashman apparently retained Berland in an attempt to find an expert who might be more favorable to Kimbrough for mental health mitigation purposes.  Although Berland thought there were mental health issues which could have been presented at the penalty phase, he thought they would be difficult to present to the jury.  Cashman chose not to put Berland on the stand because she thought he would testify that Kimbrough had "hidden craziness."  She was concerned that the prosecution would portray Kimbrough as faking mental illness and noted that Berland's intelligence testing, which gave Kimbrough an IQ of ninety-four, placed him in the normal range of intelligence.  Cashman was aware that the cutoff for mental retardation was seventy and that seventy-six reflected a low IQ.

Cashman testified that she always ensured the mental health experts she retained had adequate background information on her clients. She recalled that Kimbrough's family members were not particularly cooperative in this case.

Kelly Sims, Cashman's cocounsel, was certain that he had telephone conversations with Mings prior to the time Cashman wrote the note that was found in Kimbrough's file. Sims stated that his practice at the time was not to write notes that could prove harmful to his client because he thought they could fall into the wrong hands. Although he said Cashman was better at taking notes than he was, "she was specifically never going to put anything down that may hurt her client." Sims explained any absence of notes from Cashman is evidence "that something bad happened because she is a prolific note-taker." He did not recall any specific reasons for striking Mings from the witness list but said, "[I] know we must have talked about it and I was in agreement with it." Sims further stated that if he had thought striking Mings was a mistake, he would have relisted him.

Sims testified that he thought Berland was retained as a second opinion to try to develop some mental health issues. He did not recall whether retaining Berland was his idea or Cashman's. Sims testified that there was nothing in the public defender file that would tell him why Berland was not used but stated that the decision would have been made based on what Berland was going to testify to at trial.

With regard to waiving potential mental health mitigation, Sims testified that while others may have had input on the decision, ultimately it was his choice and his decision. He did not remember discussing with Kimbrough the decision not to present mental health mitigation. Sims testified that he did not want any record discussion of the issue and said, "I just did not want to bury any hope for Mark Kimbrough later down the line. And I think that's what Ashton was trying to do. And that's not my job to help clean up the State's case." Sims stated: "I know that in my relationship with Mr. Kimbrough I had laid out everything that we did and talked about the pros and cons of it and thought I would make some coherent cohesive argument about why we had to do A, B, or C and spent hours talking about it." But, Sims thought he did not have a very good level of communication with Kimbrough. When asked about the theme of any mitigation defense, Sims stated:

I recall that the theme was thread bare, that the main theme was that it didn't seem Mark had all that high of an IQ with respect to just dealing with figuring out problems in his life.

It seemed like he had a lot of people that loved him and a lot of family that embraced him and that kind of can be contra to finding good mitigation going because people were kind of, I mean, his family wanted him and wanted to help him and I guess there was a little bit of, back when he was a teen, I can recall that some of the family members saying we wanted him to live with us and they said, no, we want him to live with us.

I know he was a skilled singer.

He had gifts to share in that field.

But as far as being able to show physical abuse or sexual abuse and some kind of brain injury or organic brain dysfunction, I don't recall us having any of that.

Sims thought that a low IQ was a potential mitigator but noted that there are plenty of inmates on death row who have been found to have IQs similar to Kimbrough's.  Moreover, Sims stated that part of his argument during the guilt phase was that Kimbrough would have been really dumb to rape and murder a girl in his own apartment complex, to let another person see him with a ladder, and to then watch the next morning while all of the crime scene investigators and detectives were there.  Sims worried that if they presented the low IQ evidence, it might have led the jury to think, "Well, he might be a dope, so he would do something that would [make it] easy to catch him."

*Testimony of Prosecutor*

The State called Jeffrey Ashton, the prosecutor at Kimbrough's trial.  Ashton was familiar with Cashman and Sims.  Ashton testified that an elevation on scale four, psychopathic deviate, was the one he hoped for on an MMPI.  He stated:  "It is the one which, just by its name, is most appealing to a prosecutor.  Because, when you can argue to a jury that this man has a high psychopathic deviant [sic] scale, just those words alone are a wonderful argument for a jury."  The words alone have a negative connotation.  Ashton further stated:

> [M]y experience generally is that when you ask for a definition
> of what does psychopathic mean, the definition you get is one
> of someone, you know, who lacks a well-developed
> conscience, you know, does not feel remorse, guilt, things of
> that general way. So it's something that it's hard to spin that
> as positive or sympathetic in my experience.

Ashton stated that if he had known a scale four would come up, he would
have used experts to characterize Kimbrough as dangerous. He would have
gone into the characteristics of psychopathy, would have quoted some of the
"less favorable descriptions of psychopaths," and would have equated
psychopathy to antisocial personality disorder. He also stated he would
have questioned expert witnesses about their knowledge of Kimbrough's
prior criminal acts, both charged and uncharged, and would have asked
about previous known acts of violence.

As to a potential "remorse" mitigator, Ashton testified that "[e]xpressions of
remorse, when you're in jail, after you've been caught and convicted, you
know, are risk for argument of the insincerity of the supposed remorse." He
further noted that the remorse argument opens the door to testimony as to
the actions or conduct of the defendant that are inconsistent with remorse.
Questions of character and the like generally open the door to questions
about the full range of the defendant's possible misconduct. In this case, it
might have opened the door for evidence that Kimbrough had previously
been involved in a gang fight.

*Testimony of Defense Investigator*

The State called Barbara Pizarroz, the defense investigator. In the course of
investigating Kimbrough's case, Pizarroz spoke with some twenty-two
witnesses, obtained school and medical records, and spoke with Dr. Berland
in an attempt to find some supporting data for brain damage. She met with
Kimbrough's family members, friends, teachers, and coaches. Pizarroz
traveled to Memphis as part of her investigation. She also met with
Kimbrough on a number of occasions. She testified that for the most part he
had a family who loved him.

Pizarroz testified:

> For the most part, and I just don't want to get personal, but for
> the most part he has a family who just absolutely loves him.

41

They spoke well of him, very caring. They were, you know, all totally devastated by this incident. And for the most part, you know, he had a family that absolutely loved him. But he was kind of shuffled from family member to family member, you know, when he was young.

As far as his parents are concerned, that was a situation where Mark . . . learned as a young boy that he was fathered by someone other than who he believed to be his father. And then he became involved with another gentleman who was with his mom for, I don't know, six or eight years who took on a father figure.

Prior to Kimbrough's trial, Pizarroz had worked on a number of cases with Berland, obtaining information that Berland needed to make his evaluation. In general, she was familiar with what information a mental health expert would need in a first-degree murder case. By the time she investigated the Kimbrough case, she had worked dozens and dozens of cases where the mental health aspect of a case was important. Pizarroz was also familiar with Mings and had supplied information to him for past evaluations.

*Testimony of Mental Health Experts*

Mings testified that a spike on scale four, psychopathic deviate, is not a formal DSM [FN7] diagnosis. He could not recall diagnosing Kimbrough with antisocial personality disorder, but it was possible that he discussed antisocial personality with Cashman as a possible diagnosis for Kimbrough. He stated that scale four of the MMPI measures traits which are found in persons with antisocial personality disorder but noted that such traits can also be found in normal people. Mings spent about eight hours with Kimbrough in testing and then another seven hours or so scoring the tests, reviewing background materials, and talking to attorneys. He requested an additional five hours for background material, and while he had no clear recollection, his impression was that he did not get much from Kimbrough and wanted to talk to other people to find out more details.

FN7. American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000).

Dr. Bill Mosman, a forensic psychologist and practicing attorney from the Miami, Florida, area, testified regarding potential statutory and nonstatutory

mitigators which were not introduced at trial. Mosman reviewed various materials provided by Berland, reviewed the work of Dr. Sidney Merin, the State's mental health expert, reviewed the sentencing transcript, reviewed school records, and had conversations with Berland. Mosman did not personally examine Kimbrough prior to testifying and did not administer any tests to Kimbrough. He reviewed the defense investigator's file and recognized that Pizarroz "did voluminous amounts of work." From his review of the materials, Mosman thought that "from a statutory point of view, there were 5 statutory mitigators that were available and well reasonably could have been argued. From a hyper technical point of view there were three, but two of those are disjunctive." As to the potential statutory mitigators, Mosman stated:

> They are a felony was committed while under the influence of extreme mental disturbance, felony committed while under the influence of extreme emotional disturbance, and mental is different than emotionally, capacity to appreciate the criminality of his conduct was substantially impaired, capacity to conform his conduct to the requirements of law was substantially impaired.

> Age of the defendant at the time of the crime clearly, clearly, multiple severe impairments in that area, these are the statutory ones.

Mosman testified that his review of the record and applicable case law revealed some thirty nonstatutory mitigators that could have been argued to the jury. Mosman stated:

> The 30 are clearly a potential, an ability to be rehabilitated. There is a lack of family life that's separate. And background. Those are not the same ones. To collapse them is a complete misunderstanding of what the mental health process and the development of the child is all about.

> There was history of neglect, disadvantage or deprived childhood, clearly educational deficits, emotional impairments, and results of any emotional disturbance. Those are separate and separately found in forensic materials and training in cases, emotional disturbance, even if not extreme.

43

There is extreme mental or emotional disturbance which is separate again, mental impairments, both cognitively and intellectually in the record.  It's right in the data base.

Medical problems or history of injuries that is in the records, utilization, drugs or alcohol, previous contributions to the community or society.  That was, is, and existed in the records.  Psychological difficulties.

There is another one that's recognized and it's a tongue twister.  It's called iatrogenises from the systems and it's spelled "iatrogenises."  Forensically, that's described as systems aware of problems and fail to deal with it. And we'll get into what that means later.

Remorse, positive confinement record, excuse me, and because I am testifying today and all of those record we would add another one, a good prison record.  There is another one, behavior during trial.  Those are disjunctive, not the same thing at all.  Non anti-social personality, cannot be diagnosed, and that has to be a non-statutory mitigator in these types of situations.  Can function in a structured environment.  That's a separate one.   Crime, itself, was out of character to the preincident situation.  Another one, he lost his cousin several years ago.  Any impact that had on him.  Failure to maintain relationship with family members that is in the records and it has been separately to be found mental health related non-statutory mitigators.

Mild brain abnormality.  I will say that again.  Mild brain abnormality.  M.V.D. mental, grew up without a father is separate from the background issue and lack of family life, educational difficulties, positive traits and I can't even read my handwriting here.  Yes.  I can.

Mental and emotional handicaps, so those in a summary and while I understand some sound similar, they are actually different but the last one or two perhaps from a real technical mental health perspective, they are separate they enter play out [sic] on what was going on here so I think that if you count

them up, that would be 30 non-statutory and 5 statutory from a mental health perspective.

Mosman also testified that Kimbrough had an extreme emotional disturbance at the time of the crime due to various stressors which were acting on his life.

Mosman stated that Kimbrough's capacity to conform his conduct to the requirements of the law was substantially impaired. This impairment was based upon the lack of "stability" or "consistency" in Kimbrough's upbringing. During his upbringing, Kimbrough learned that if he had emotional needs he had to take care of them himself.

In support of the statutory age mitigator, Mosman explained that "[a]ge has to do with mental age, developmental age, social age, intellectual age, moral age." Kimbrough rated a ten percentile rating "from all the years of academic functioning." His school records also reflected annual testing where "76 out of 100 of his same age peers were educationally much more sophisticated and skilled than he." Mosman calculated that based on an IQ of seventy-six, Kimbrough had the intellectual efficiency of a thirteen-year-old child. Kimbrough's emotional age, his ability to relate and engage in mature interpersonal relationships, was also low.

On cross-examination, Mosman acknowledged that this was not the first time he had testified in a capital case that a defendant's mental age does not match his chronological age. He had previously testified that a thirty-eight-year-old man had the mental or developmental age of a fourteen-year-old. Mosman was not aware that this Court upheld the trial court's rejection of this proposed mitigator because his opinion was contradicted by the other twenty-five witnesses called by the defense during the penalty phase. He agreed that none of the various IQ test scores in this case placed Kimbrough in even the mild mental retardation range.

Mosman noted that Pizarroz found notes from a long-term girlfriend of Kimbrough's who said that he was well-mannered and stated that Kimbrough was able to maintain relationships with "cousins, aunts, uncles, people that he met." Relying on this evidence, Mosman testified that a jury could conclude that the Collins rape and murder, followed by one other rape[FN8] was out of character for Kimbrough. Mosman referred to a Federal Bureau of Investigation manual describing the various types of rapes and concluded that Kimbrough's second rape fit the "expressions of relationship

fantasies" category.  On cross-examination, however, Mosman agreed that his testimony concerning relationship "fantasy rape" was made without having talked to Kimbrough about what he was thinking at the time he committed the rape.

> FN8. Between the time of the Collins murder and the time he was charged with the murder, Kimbrough committed another rape.  He pled guilty to the rape charge.

Mosman stated that mild brain abnormality might be found in the frontal lobe and "could have been argued."  He thought the Weschler and MMPI tests could be used to argue brain damage or abnormality even though a PET scan rendered a normal reading.  Although Mosman did not administer any tests to Kimbrough, he thought referrals could have been made to obtain additional testing.

Mosman noted that Kimbrough exhibited no evidence of a conduct disorder prior to the age of fifteen, was not aggressive, was not a disciplinary problem in school, and behaved well with his family.  Accordingly, Mosman said that antisocial personality disorder could not be diagnosed in this case.

On cross-examination, Mosman said that he has been called to testify in thirty to thirty-five homicide and capital postconviction cases in Florida since 1990.  In each of these cases, Mosman was called by the defense.  When asked about the underlying data to support his opinion that the statutory mental mitigators applied at the time of the crime, Mosman asserted that he relied upon Kimbrough's traditional level of functioning.   However, Mosman agreed that he did not talk to Kimbrough's mother, his other relatives, his friends, or his girlfriend to see if Kimbrough was somehow disordered in his thoughts at the time of the Collins murder.  Mosman said that he did not do so because "[t]hey would have, in all probability, no information on that issue at all."

In rebuttal, the State called Dr. Sidney Merin, a psychologist specializing in clinical psychology and neuropsychology.  Merin conducted a court-ordered neurological and psychological examination of Kimbrough.   He also reviewed background materials relating to Kimbrough and the criminal proceedings against him.  Merin interviewed and tested Kimbrough for just over six hours.  He administered an IQ test and testified that Kimbrough had a full scale IQ of eighty-one, which is in the low average range.   Merin thought that Kimbrough had a learning disability and that his "fund of

information" was low.  Merin also administered other tests which placed Kimbrough in the lower end of the average range.  Merin stated: "I would conclude that he's probably in the low average range overall."

Merin testified that tests performed on Kimbrough revealed a statistically significant elevation in the psychopathic deviate scale.  As to the significance of this result, Merin stated:

> What you're more likely to say is this represents a significant degree of real rebelliousness in the personality, a significant degree of superficiality, an inclination not to become deeply, emotionally involved with others, although on the surface they can appear very nice.  They make a good first impression.  And after you talk with them a while, you begin to see what they're saying doesn't fit together, doesn't seem to-it's not that it doesn't make sense, but it seems to be selfserving.  Also found with people who have conflict with authority, who are manipulative, who are confidence people, who can act impulsively, who can defy the rules, who can be insensitive to the feelings of others, have a lot of difficulty with empathy.  These are people who sometimes have a history of being under-achievers.  Or, again, they may be impulsive, may have a tendency to blame their family for whatever occurs to them or blame other people for whatever occurs to them, although projection on this scale is not necessarily a prominent feature.

Merin testified that based on the results of all the tests he administered, he did not find that Kimbrough suffered from a serious emotional or mental disorder.  However, he did find an Axis II, or behavioral disorder, and a general personality disorder with borderline and antisocial features.  Merin also diagnosed a learning disability, which was due to Kimbrough's personality characteristics and not due to brain damage.  As far as brain functioning, Merin said that he did not see any problems.

Merin testified that he would not have found any statutory mitigating circumstances in this case.  As a single nonstatutory mitigator, Merin might have found a borderline personality disorder which had its underpinnings possibly in Kimbrough's unstable early childhood.  He noted, "that's a rather mild non-statutory."  Merin did not find any evidence that Kimbrough suffered from an extreme mental or emotional disturbance at the time of the crimes and did not find any evidence that Kimbrough's capacity to

appreciate the criminality of his conduct at the time of the crime was substantially impaired.

Merin did not find evidence to support a conclusion that Kimbrough's developmental or emotional age was less than his chronological age.  Merin also did not agree that Kimbrough qualifies for a borderline intellectual functioning diagnosis, stating:

> Well, first of all, I don't agree with your definition of borderline because-I don't agree with it because he's got many areas where he's perfectly average.  So I would not in any way- I would not in any way suggest that he has a borderline, whatever it was, diagnosis that you're referring to.  And you asked which ones?  Well, let's just take a look at it.  I referred to them earlier.  We can take a look at it again.  Average vocabulary, average verbal abstraction scores, average visual reasoning, average nonverbal comprehension skills and several of those are just a smidgin below average.  So I would not in any way suggest that he's got that borderline intellectual deficit.  If you're just gonna use a number-which doesn't really mean anything, any psychologist will tell you those IQ numbers don't mean anything, because next week it could change.   What you look for are levels and the way it's distributed.

*Trial Court's Findings*

In its order denying Kimbrough's 3.850 motion, the court devoted eight pages to the resolution of Kimbrough's *Ake* claim and set forth its factual findings.  The court agreed that Cashman misunderstood the significance of the psychopathic deviate scale but noted that Sims, who understood the scale, concurred with striking Mings.  The court held that the decision not to call Mings and Berland was a reasonable trial tactic.

The court found that Kimbrough failed to establish that additional materials or preparation would have enabled Mings, Berland, or any other doctor to conduct a more thorough mental health evaluation or to provide mitigation testimony sufficient to outweigh any of the potential risks associated with their testimony.

> As to the potential mitigation found by Mosman, the court noted that he did not conduct any independent testing and that there were no witnesses at the evidentiary hearing who could have presented direct evidence regarding these potential mitigators.  The court further concluded that many of the mitigators cited by Mosman would have been given little or no weight.

*Kimbrough*, 886 So. 2d at 970-78.  The appellate court, agreeing with the trial court, found that the decision not to call the two mental health experts was a reasonable trial tactic; that Petitioner failed to establish that additional materials or preparation would have enabled either of the two experts to conduct a more thorough mental health evaluation; and that the mitigators presented by Petitioner's expert at the evidentiary hearing were based on speculation and conjecture and were rebutted by the State's witness.  *Id*. at 979-81.  Thus, the Florida Supreme Court concluded "[i]t is clear from the evidentiary hearing testimony in this case that mental health mitigation was investigated and counsel made a strategic decision not to present the mitigation.  Counsel's actions in this case were not deficient, and Kimbrough's claims are without merit."  *Id*. at 981.

Although initially gauged as an *Ake* claim, a thorough reading of Petitioner's petition and memorandum of law reveals that he is actually asserting a claim of ineffective assistance of counsel regarding the preparation and presentation of mitigating evidence.  To the extent that Petitioner asserts a substantive *Ake* claim, it is clearly without merit.  The record reflects that during his trial proceedings Petitioner was provided with not one, but two, psychiatrists to aid in his defense and assist in the presentation of mitigating factors.  Petitioner has not in any manner cast aspersions on the competency of either of the experts that assisted in his defense.  Furthermore, Petitioner has not indicated that the experts

failed to conduct appropriate examinations.  Rather, his primary complaints center on the alleged failures of counsel to utilize the information garnered by the experts, to provide the experts with sufficient background materials, and to develop additional mitigating evidence.

To determine whether counsel's performance was lacking at the penalty phase, courts must consider "'whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court.'" *Stewart v. Secretary, Dept. of Corrections,* 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006)).  "[C]ounsel's decision not to investigate and develop favorable evidence must be reasonable and fall within the range of professionally competent assistance.  Strategic choices to forego further investigation into an issue are not deficient when a reasonable professional judgment based on a sufficient initial inquiry supports the decision to terminate the investigation."  *Lynd v. Terry*, 470 F. 3d 1308, 1316-17 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).  Counsel is deficient when he or she "'totally fails to inquire into the defendant's past or present behavior or life history' in a capital  case. . . ."  *Lynd*, 470 F.3d at 1317 (quoting *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001)); *see also Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995) (holding that representation is deficient when counsel does not conduct sufficient investigation to formulate an adequate life profile of a defendant).

To determine prejudice from the unreasonable failure to investigate and present favorable and/or mitigating evidence, "we reweigh the evidence in aggravation against

the totality of available mitigating evidence." *Wiggins v. Smith,* 539 U.S. 510, 534 (2003). The critical issue is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.   This analysis requires the Court to evaluate the totality of the available mitigation evidence – both that presented at trial and at the collateral proceedings. *Williams,* 529 U.S. at 397-98.   If "the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [the defendant's] moral culpability," *Wiggins*, 539 U.S. at 538, then prejudice has been shown.

Because this issue was adjudicated on the merits in the state court, this Court may grant habeas corpus relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."   28 U.S.C. § 2254(d)(1) and (2).   The Court is cognizant that it may not substitute its judgment on this issue for judgments made by the state courts. *See Woodford v. Visciotti*, 537 U.S. 1149 (2003) (reversing appellate court's rejection of state court's finding that petitioner was not prejudiced by his counsel's failure to present mitigation evidence at the penalty phase of his trial).   This Court may not grant the writ simply because it determines that the state court erroneously or incorrectly applied the correct governing law. *Bell*, 535 U.S. at 694.   Relief is only warranted if the state court's application was objectively unreasonable. *Id.*

Petitioner first contends that defense counsel failed to recognize the "prospective rule announced in *Koon v. Dugger*, 619 So. 2d 246, 250 (Fla. 1993), requiring a court to have a defendant confirm on the record the discussion with counsel of mitigation matters and the defendant's wishes to waive presentation when such is the case." (Doc. No. 1 at 22-23.) This claim is premised on an exchange that took place after the close of the presentation of evidence during the penalty phase. The prosecutor attempted to have the court inquire of Petitioner as to whether he agreed with counsel's decision not to present mental health mitigation. Defense counsel indicated that he made a strategic decision and objected to any inquiry of Petitioner concerning confidential communications. Petitioner never stated on the record whether or not he agreed with counsel's decision. However, defense counsel stated that he had seven years experience trying first-degree murder cases, that he pretty much has every single client evaluated, that he had seen enough reports to be able to ferret out what is beneficial for his clients, and that he thought the psychologist who evaluated Petitioner was "no mitigation whatsoever." (Ex. A-10 at 521-27.)

Although Petitioner did not raise this particular point in his amended Rule 3.850 motion, he did assert it in his written closing argument after the evidentiary hearing and in his initial brief on appeal. *See* Ex. C-23 at 2152-53; Ex. C-27 at 11-15. Neither the state trial court nor the Florida Supreme Court explicitly addressed this component of Petitioner's ineffective assistance of counsel claim.

Given the specious nature of this claim, it is not surprising that it was not directly addressed by the state courts. In the *Koon* case, the petitioner claimed that his trial counsel

52

rendered ineffective assistance in connection with the penalty phase because he failed to investigate and present significant statutory and non-statutory mitigating evidence. *Koon*, 619 So. 2d at 249.   Although defense counsel had investigated potential mitigating evidence, he did not present any penalty phase testimony or evidence because the petitioner had instructed him not to do so.  *Id.* at 249, 250.  In addition, counsel was concerned that if he attempted to present witnesses, the petitioner would create a scene in front of the jury. *Id.* at 249.  Counsel did, however, argue the existence of mitigating factors based upon evidence adduced during the guilt phase. *Id.* at 250.

Under the facts before it, the Florida Supreme Court found it was not error for counsel to follow Koon's instruction not to present evidence during the penalty phase. *Id.* However, concerned that problems could arise if the trial record did not adequately reflect a defendant's waiver of his right to present any mitigating evidence, the Court announced the following prospective rule:

> When a defendant, against his counsel's advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant's decision.  Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be.  The court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence.

*Id.*

It is clear that the facts of the case do not fall within the ambit of the prospective rule announced in *Koon*.  The *Koon* rule applies when "a defendant, against his counsel's advice,

refuses to permit the presentation of mitigating evidence." *Id*.  Here, counsel made an informed, strategic decision to forego the presentation of mental health mitigating evidence.  Counsel did present a variety of other mitigating evidence.  This was not a case of a defendant tying the hands of defense counsel.  Furthermore, the United States Supreme Court recently made clear it "has never held that an 'informed and knowing requirement exists with respect to the decision to not introduce mitigating evidence.'" *Schriro v. Landrigan*, 127 S.Ct. 1933, 1936 (2007).  Clearly, defense counsel's performance was not deficient regarding this matter, and Petitioner suffered no prejudice.

Petitioner next argues that Mr. Sims made a unilateral and ill-informed decision not to present any mental health experts, thus, eliminating from consideration an abundance of mitigation information.  This contention was considered and rejected by the Florida courts on the basis that counsel made a strategic decision not to call the two experts that examined Petitioner.  "The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct."  *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998).

The Florida courts' determination was a reasonable application of clearly established federal law that is amply supported by the record and Petitioner has not overcome the presumption of correctness.  Petitioner was represented by two experienced attorneys at trial and during the course of his proceedings.  Both attorneys had serious concerns about using the experts during the penalty phase.

Dr. Mings was retained in November of 1992 to conduct a psychological evaluation of Petitioner and on July 14, 1993, was originally listed as a defense witness. (Ex. C-14 at 582, 585.) Several days after a telephone call with Dr. Mings, Ms. Cashman filed a notice striking Dr. Mings from the witness list. Ms. Cashman's notes from the telephone call reveal that she was concerned about Dr. Mings' indication that the tests showed "fifth percentile WAIS-R M.M.P.I. valid but defensive spike on scale four, psychopathic deviant." *Id.* at 589. Based on her past experiences with the prosecutor, she was certain that he would use such information "[t]o make [Petitioner] look really dangerous and make the jury scared of him and want to kill him."[10] *Id.* at 727-28. Ms. Cashman also stated that she was sure that this was not the only reason she struck Dr. Mings and that she consulted with Mr. Sims and other attorneys in her office regarding whether or not to use Dr. Mings as a witness. *Id.* at 595-96, 720-21.

Once Dr. Mings was stricken, defense counsel retained a second expert, Dr. Berland, who they hoped would be more favorable to Petitioner. After conducting a variety of tests, Dr. Berland indicated that Petitioner had some mental health issues but was concerned that they would be difficult to present to the jury. (Ex. C-14 at 741-43.) Ms. Cashman had reservations about using Dr. Berland because the prosecutor could argue that Petitioner was malingering. (Ex. C-15 at 752-54.) She discussed the different factors regarding Dr.

---

[10]This concern was corroborated by the prosecutor's testimony at the Rule 3.850 hearing: "The scale 4 was the, the one I most hoped I would see in an MMPI. It is the one which, just by its name, is most appealing to a prosecutor. Because, when you can argue to a jury that this man has a high psychopathic deviant (sic) scale, just those words alone are a wonderful argument for a jury." (Ex. C-18 at 1264.)

Berland with Mr. Sims and other attorneys in her office, ran it by Petitioner, and decided

not to use Dr. Berland.  *Id*. at 756-58.  Cashman characterized the decision as "the best

strategic decision under the circumstances."  *Id*. at 758.

Mr. Sims testified that he was in close contact with Ms. Cashman during the period

of time when she struck Dr. Mings from the witness list and that they discussed striking

Dr. Mings.  (Ex. C-15 at 836-38, 861.)  They were concerned about the doctor using the word

"sociopath" and saying that Petitioner had no morals.  *Id*. at 861-64.  According to Mr. Sims,

when he was appointed to the case approximately two weeks after Dr. Mings was

stricken,[11] he would have relisted Dr. Mings if he thought a mistake had been made.  *Id*. at

842.  Instead of using Dr. Mings, the attorneys decided to try and get another expert, Dr.

Berland, involved.  *Id*. at 863-64, 905-06.  Mr. Sims indicated that he had no independent

recollection of talking with Dr. Berland, but he assumed that they decided not to use the

doctor "based on what he said or where the pitfalls with his testimony would be."  *Id*. at

877-78, 904.

The record reflects that defense counsel's concerns about the potential negative

consequences associated with calling Drs. Ming and Berland were well-founded, especially

in light of the minimal amount of useful information the experts could have provided.  Ms.

Cashman and Mr. Sims made an informed, reasoned decision not to call the mental health

---

[11]Mr. Sims was employed by the public defender's office and originally represented Petitioner.  During the course of the state court proceedings, Mr. Sims left the public defender's office and entered private practice.  At that time, Ms. Cashman took over Petitioner's case.  However, after several months, Mr. Sims was appointed to continue representing Petitioner along with Ms. Cashman.

experts. This decision was neither unreasonable nor deficient. *Adams v. Wainwright*, 709

F.2d 1443, 1445 (11th Cir. 1983), *cert. denied*, 464 U.S. 1063 (1984) (a tactical decision amounts

to ineffective assistance of counsel "only if it was so patently unreasonable that no

competent attorney would have chosen it").

Petitioner also argues that defense counsel failed to have Dr. Berland investigate or

develop the issue of brain damage. During the course of the Rule 3.850 proceedings,

Petitioner sought a continuance to arrange a PET scan. In support of the request, he

included an affidavit by Dr. Berland recommending that the PET scan be conducted as part

of the preparation for the evidentiary hearing. *See* Ex. C-21 at 1672-81. In the affidavit, Dr.

Berland states that during his original 1994 evaluation of Petitioner the data raised a

consideration of brain injury. *Id*. at 1673. However, because the information was

unsubstantiated and Petitioner so steadfastly denied all symptoms of mental illness, Dr.

Berland concluded, at the time, that pursing the issue of brain injury was not justified. *Id*.

at 1673, 75-76. However, in 2001 Dr. Berland spoke with a lay witness who corroborated

Petitioner's account of an incident involving a potential brain injury. *Id*. at 1677-78. Based

on the corroborating information, Dr. Berland recommended a PET scan to "provide

objective, medical verification of brain injury." *Id*. at 1679. The trial court subsequently

granted the motion for continuance, and a PET scan was conducted. Petitioner's expert at

the Rule 3.850 hearing testified that the PET scan results showed no brain abnormality. (Ex.

C-17 at 1175.)

Petitioner has not demonstrated what further actions defense counsel failed to take with regard to Dr. Berland's investigation of a possible brain injury or that the failure resulted in any prejudice.  Although Dr. Berland successfully discovered a corroborating witness during the Rule 3.850 proceedings, there is no indication that this witness was readily available and discoverable during the earlier trial proceedings.  Furthermore, the discovery of the witness did not lead to the conclusion that Petitioner suffered a brain injury or abnormality.  On the contrary, the PET scan showed no abnormality.

Dr. Mosman, who testified for Petitioner at the Rule 3.850 hearing, stated that Petitioner suffered from "mild brain abnormality."  (Ex. C-17 at 1134.)  However, Dr. Mosman did not personally examine Petitioner or administer any tests.  Dr. Merin, who testified for the State at the evidentiary hearing, directly disputed the contention that Petitioner suffered from brain damage.  (Ex. C-19 at 1537-40.)  Petitioner has not demonstrated deficient performance or prejudice regarding this matter.

Petitioner next contends that Ms. Cashman made "an egregious error when she misunderstood and misinterpreted her psychologist as referring to 'psychopathic deviant.'" (Doc. No. 8 at 76.)  Based on the record, it appears that Ms. Cashman may have mischaracterized the MMPI scale 4 as a "psychopathic deviant" diagnosis rather than the correct "psychopathic deviate" scale when weighing whether to use Dr. Mings as a witness. However, the record is clear that the decision to strike Dr. Mings was jointly made and that Mr. Sims understood the proper meaning of the scale.  *See* Ex. C-15 at 860-61.  In addition, the testimony at the evidentiary hearing also supported Ms. Cashman's concern that the

58

prosecutor would use the MMPI scale to argue to the jury that Petitioner was dangerous. Ms. Cashman's error was neither egregious, deficient, nor prejudicial.

Having reviewed the record and considered Petitioner's arguments, it is clear that the state courts' decisions regarding these issues were neither contrary to, nor an unreasonable application of, clearly established federal law.  Petitioner also has not demonstrated that the state courts made an unreasonable determination of the facts.  Here, nothing in the record (or in Petitioner's submissions) suggests that the state court's factual findings were unreasonable.  Further, Petitioner has failed to rebut the presumption of correctness accorded the state court's factual findings.  Accordingly, claim nine must be denied under section 2254(d).

**J.      Claim X**

Petitioner avers that the trial court erred by failing to grant an evidentiary hearing as to claims two, four, six, seven, and eighteen of his amended Rule 3.850 motion.  In particular, he asserts that the denial of a hearing prevented him from establishing ineffective assistance of counsel and resulting prejudice regarding the named five claims. Petitioner further asserts that the denial of a hearing violated the Sixth and Eighth Amendments, as well as the Due Process Clause of the Fourteenth Amendment.  He unsuccessfully asserted this claim on appeal from the denial of his Rule 3.850 motion. *Kimbrough*, 886 So. 2d at 981-84.

Procedurally, it is clear that this claim is not properly reviewable in a federal habeas proceeding.  "A habeas petition must allege that the petitioner's detention violates the

constitution, a federal statute, or a treaty. . . .   [A] petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings." *Franzen v. Brinkman*, 877 F.2d 26 (9th Cir.), *cert. denied*, 493 U.S. 1012 (1989).  In *Spradley v. Dugger*, 825 F.2d 1566 (11th Cir. 1987), the petitioner argued that the state trial court violated his due process rights when it denied his Rule 3.850 motion because it did not conduct an evidentiary hearing and because its opinion denying relief failed to attach those portions of the record on which it relied.  The Eleventh Circuit Court of Appeals held that the state trial court's alleged errors in the Rule 3.850 proceedings did not undermine the validity of the petitioner's conviction; therefore, the claim went to issues unrelated to the cause of the petitioner's detention, and it did not state a basis for habeas relief.  *Id*. at 1567; *see also Mitchell v. Wyrick*, 727 F.2d 773, 774 (8th Cir.) ("Even where there may be some error in state post-conviction proceedings, this would not entitle appellant to federal habeas corpus relief since appellant's claim here represents an attack on a proceeding collateral to detention of appellant and not on the detention itself.") (quotation omitted) (citation omitted), *cert. denied*, 469 U.S. 823 (1984).[12]  In this claim, Petitioner alleges errors in the state postconviction review process which are not addressable through habeas corpus proceedings; consequently, it must be denied.

### K.     Claim XI

---

[12]In *David v. Price*, No. CIV. A. 97-7643, 1998 WL 404546, at *2 (E.D. Pa. July 15, 1998), the district court noted that "the majority of Circuits have held that . . . deficiencies [or errors in state post-conviction proceedings] are not reviewable in federal habeas proceedings."  The district court also listed those circuits in the majority and the one circuit in the minority.

Petitioner asserts that Florida's death penalty statute, as applied in this case, violates the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution pursuant to *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Specifically, Petitioner asserts that death penalty aggravating circumstances should be charged in the indictment, submitted to the jury, and proved beyond a reasonable doubt. (Doc. No. 1 at 38-40.)  Petitioner raised this basic claim in a petition for writ of habeas corpus filed with the Supreme Court of Florida which denied relief.  *Kimbrough*, 886 So. 2d at 984.

In *Ring*, the United States Supreme Court held that "a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for imposition of the death penalty." *Ring*, 536 U.S. at 609.  Instead, "the Sixth Amendment requires that [those circumstances] be found by a jury." *Id.*   However, *Ring* does not apply retroactively to cases which were already final on direct appeal at the time *Ring* was issued.  *See Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

In the instant case, Petitioner's case became final on direct appeal in 1997, nearly five years before the United States Supreme Court's decision in *Ring*.  The holding in *Ring*, therefore, cannot be applied to this case, and this claim must be denied.

## L.     Claim XII

In his final claim, Petitioner asserts that his Eighth Amendment right against cruel and unusual punishment will be violated because he may be incompetent at the time of his

execution.[13] He raised this claim in his state habeas corpus petition, but the Supreme Court of Florida denied relief after Petitioner conceded that it was not ripe.[14]

Respondents argue that this claim is premature because it cannot be raised until a death warrant is signed. This Court agrees. A *Ford* claim does not become ripe until the prisoner's execution is imminent. *See Panetti v. Quarterman*, 127 S.Ct. 2842, 2854-55 (2007). Thus, this Court dismisses claim XII without prejudice to Petitioner's right to raise it again when the issue becomes ripe for adjudication.

## V.    CONCLUSION

The Court finds that none of the claims raised in the instant petition has merit or requires a hearing in this Court. Any of Petitioner's allegations not specifically addressed herein are determined to be without merit. The Court determines that the petition must be denied and that this case must be dismissed with prejudice.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.    The Petition for Writ of Habeas Corpus filed by Darius Kimbrough (Doc. No. 1) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

---

[13]In *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986), the United States Supreme Court held that "the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane."

[14]Under Florida law, the issue of competency for execution may not be raised until a death warrant has been executed. In the state habeas proceedings, Petitioner acknowledged that the claim was premature under Florida law, but indicated that he asserted the claim in order to preserve his ability to raise it in federal court.

      2.      The Clerk of the Court shall enter judgment accordingly and is directed to close this case.

      **DONE AND ORDERED** at Orlando, Florida, this 26th day of February, 2008.

ANNE C. CONWAY
United States District Judge

Copies to:
sa 2/26
Counsel of Record